UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

RONALD L. MABINE,
    Plaintiff,

v.

UNITED STATES OF AMERICA,
NAVEED GILL, M.D., in her individual capacity,
AMBER MARTZ, N.P.., in her individual capacity,
C. SHELTON, H.S.A., in her individual capacity,
    Defendants.

Case # 2:24-cv-02556-TLP-tmp

**RECEIVED**

DEC 09 2025

Wendy R Oliver, Clerk
U.S. District Court
W.D. OF TN. Memphis

## FOR AMENDED COMPLAINT

Plaintiff Ronald L. Mabine brings this action for damages against Defendants for denying him medically necessary treatment for Lupus and gastroesophageal reflux disease. For eight years, doctors controlled Mabine's Lupus with prednisone. In September 2023, Nurse Practitioner Amber Martz abruptly stopped his medication without a doctor's examination. His skin erupted in lesions. Permanent scars formed across his hands, neck, and back. For five months, he returned to sick call each week showing open sores, but Martz refused treatment.

### I. JURISDICTION AND VENUE

1. This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1346(b)(1) (Federal Tort Claims Act), and 5 U.S.C. § 702 (Administrative Procedure Act).

2. Venue is proper under 28 U.S.C. § 1391(b) because Defendants reside in this district and the events occurred at FCI Memphis in Shelby County, Tennessee.

3. Plaintiff exhausted administrative remedies. On November 20, 2023, Plaintiff filed Administrative Claim No. TRT-MXR-2024-01064 with the Federal Bureau of Prisons. The BOP denied the claim on January 33 2024. Plaintiff timely filed this action within six months of the denial.

### II. PARTIES

4. Plaintiff Ronald L. Mabine is a federal prisoner in the custody of

1

the Federal Bureau of Prisons. He was incarcerated at FCI Memphis from August 24, 2023, through June 2025. He is now confined at LSCI Butner in Butner, North Carolina.

5. Defendant United States of America is sued under the Federal Tort Claims Act, 28 U.S.C. § 2671 et seq., as the proper defendant for the negligent acts and omissions of its employees Gill, Martz, and Shelton while acting within the scope of their employment.

6. Defendant Naveed Gill, M.D., was at all relevant times a medical doctor employed by the BOP at FCI Memphis. She served as the Clinical Director and supervised all medical staff, including Nurse Practitioner Martz and HSA Shelton. Dr. Gill had final authority over all medication decisions. She is sued in her individual capacity for violations of Plaintiff's Eighth Amendment rights under Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics, 403 U.S. 388 (1971).

7. Defendant Amber Martz, N.P., was at all relevant times a nurse practitioner employed by the BOP at FCI Memphis. She provided direct medical care to Plaintiff and made the decisions to discontinue his prednisone and omeprazole. She is sued in her individual capacity for violations of Plaintiff's Eighth Amendment rights under Bivens.

8. Defendant C. Shelton, H.S.A., was at all relevant times a Health Services Administrator employed by the BOP at FCI Memphis. She had supervisory authority over healthcare delivery and administrative decisions regarding Plaintiff's medical treatment. She is sued in her individual capacity for violations of Plaintiff's Eighth Amendment rights under Bivens.

III. FACTUAL ALLEGATIONS

A. Plaintiff's Medical Conditions

9. Plaintiff was diagnosed with systemic lupus erythematosus (Lupus) in 1992. Lupus is a chronic autoimmune disease that causes the immune system

2

to attack healthy tissue. Without treatment, Lupus causes severe pain, organ damage, and disfiguring skin lesions.

10. In June 2015, a physician prescribed prednisone to treat Plaintiff's Lupus. Prednisone is a corticosteroid that suppresses the immune system and controls inflammation. From June 2015 through August 2023, prednisone successfully controlled Plaintiff's Lupus symptoms. He remained on this medication continously for eight years.

11. During those eight years at FCI Hazelton, Plaintiff's prescribed prednisone dosages varied based on disease activity. His medication records show: prednisone 10mg tablets for 97 days starting October 2, 2022; prednisone 5mg tablets (one-half tablet, 2.5mg daily) for 30 days starting December 1, 2022; and periodic methylprednisolone injections (80mg intramuscularly) on December 15, 2022, and methylprednisolone sodium succinate 25mg/2mL injection on January 4, 2023. These dosages fell within the low-dose maintenance range that medical guidelines recommend for long-term lupus management.

12. Plaintiff was also diagnosed with gastroesophageal reflux disease (GERD) in 2021. GERD causes stomach acid to flow back into the esophagus, creating severe burning pain and potentially causing permanent damage to the esophageal lining. A physician prescribed omeprazole 20mg daily for long-term use to prevent this damage.

B. Transfer to FCI Memphis and Denial of Treatment

13. On August 24, 2023, the BOP transferred Plaintiff from FCI Hazelton to FCI Memphis. He brought his complete medical records documenting his Lupus diagnosis, eight years of successful prednisone treatment, and his GERD diagnosis requiring omeprazole.

14. In September 2023, Plaintiff met with Defendant Nurse Practitioner Amber Martz for his initial medical screening at FCI Memphis. Plaintiff informed Martz that he had Lupus, showed her his medical records documenting eight

3

years of prednisone treatment, and told her he needed his medications immediately.

15. Plaintiff specifically told Martz: "I have lupus and it is going to be a problem because I need my medications, and I need to see a dermatologist." He explained that prednisone had successfully controlled his Lupus for eight years from 2015 through 2023.

16. Martz reviewed Plaintiff's medical charts showing his Lupus diagnosis and years of prednisone treatment. After reviewing the records, she refused to provide the medication. She told Plaintiff: "I am not going to give you all that prednisone. That's too much prednisone."

17. Martz did not order any physician evaluation before discontinuing Plaintiff's prednisone. She did not implement any tapering protocol to gradually reduce the dosage. She did not test Plaintiff's adrenal function. She simply stopped the medication that had controlled his disease for eight years.

18. On September 21, 2023, Martz also discontinued Plaintiff's omeprazole. She told Plaintiff he could "buy it on commissary." The commissary did not sell omeprazole. The over-the-counter antacid products available on commissary were much weaker and did not control Plaintiff's GERD symptoms.

19. Defendant Dr. Naveed Gill, as Clinical Director and supervising physician, had authority over all of Martz's medical decisions. Dr. Gill reviewed and cosigned all of Martz's orders, including the decision to discontinue Plaintiff's prednisone and omeprazole.

20. In September 2023, Plaintiff attempted to meet with Dr. Gill to appeal Martz's decisions. Dr. Gill refused to examine Plaintiff. She would not meet with him or review his complaints. Staff told Plaintiff that Dr. Gill "would hide in her office" and was unavailable to see inmates.

21. After Dr. Gill reviewed Plaintiff's medical records showing his documented need for these medications, she denied the treatment requests and approved Martz's decision to withhold the medications.

4

## C. Physical Harm from Denial of Treatment

22. Without prednisone to control his Lupus, Plaintiff's condition rapidly deteriorated. Within weeks, painful lesions erupted across his skin. Open sores appeared on his hands and inside his mouth. A painful rash spread across his neck and back. A large knot developed on his right shoulder and continued growing.

23. Plaintiff went to sick call every week showing these worsening symptoms to medical staff. Each time, he requested his prescribed medications. Each time, Martz and the medical staff refused treatment.

24. The skin lesions became infected. The sores would not heal. The pain intensified. Plaintiff experienced joint pain, fatigue, and swelling throughout his body.

25. Over five months from September 2023 through January 2024, Plaintiff's Lupus went untreated. The lesions left permanent, disfiguring scars on his hands, neck, and back. These scars are visible and permanent.

26. The denial of treatment caused Plaintiff severe physical pain for five continuous months. The pain interfered with his sleep, daily activities, and ability to function. The visible scarring caused emotional distress low self-esteem, and shame about his physical appearance.

27. Plaintiff also experienced severe acid reflux pain from untreated GERD during this period. Without omeprazole, stomach acid burned his esophagus daily, causing pain and difficulty swallowing.

## D. Plaintiff's Attempts to Obtain Treatment

28. On November 1, 2023, Plaintiff submitted an informal grievance requesting his prescribed medications. The response advised him to return to sick call, but provided no treatment.

29. On November 21, 2023, Plaintiff filed a formal BP-9 grievance requesting treatment for his Lupus and GERD. On December 7, 2023, the Warden responded

that Plaintiff had been placed on a waiting list to see an outside rheumatologist. No medications were provided.

30. On January 2, 2024, Plaintiff filed a BP-10 appeal to the Regional Director. On January 5, 2024, the Regional Office rejected the appeal, claiming Plaintiff missed the 20-day deadline from the Warden's December 7 response. This rejection violated BOP regulations because Plaintiff filed within the required timeframe.

31. On January 24, 2024, Plaintiff filed a BP-11 appeal to the Central Office. The Central Office rejected the appeal, claiming Plaintiff did not properly re-submit his BP-10 per the requirements stated in the rejection letter. These procedural rejections violated federal regulations governing the adminstrative remedy process.

E. Eventual Treatment and Continuing Harm

32. In late January 2024, after five months without treatment, FCI Memphis finally scheduled Plaintiff for an appointment with an outside rheumatologist.

33. On June 5, 2024, Plaintiff was seen by a rheumatologist at Regional One Health in Memphis, Tennessee. The rheumatologist's notes document that Plaintiff "was diagnosed in 1992 via skin biopsies" showing "numerous hyper-pigmented plaques over his face, extremities, and back." The notes state Plaintiff "also reports cutaneous ulcerations and open sores on the back."

34. The rheumatologist prescribed a standard burst-taper protocol: 40mg prednisone for one week, then 30mg for one week, then 20mg for one week, then 10mg for one week. The rheumatologist also prescribed omeprazole 20mg daily, specifically noting "PPI for GERD especially while receiving concurrent high risk medications."

35. On June 6, 2024, Defendant Martz reviewed the rheumatologist's orders. She provided the prescribed omeprazole but refused to provide the full prednisone regimen ordered by the specialist. Medical records show she provided only

6

a limited course of prednisone, not the full treatment the rheumatologist prescribed.

36. The rheumatologist's June 2024 notes specifically stated: "Counseled to limit steroid use, and that higher doses are generally not used unless SLE with major organ involvement." Despite this routine counseling about long-term steroid risks, the rheumatologist prescribed the burst-taper protocol because Plaintiff needed immediate treatment for his active Lupus flare.

37. The rheumatologist ordered Plaintiff to return in three months (September 2024) and referred him to dermatology for evaluation of his "ulcerative skin disease" and permanent scarring.

38. Martz's refusal to provide the full treatment ordered by the rheumatologist demonstrated her continued indifference to Plaintiff's medical needs, even after a specialist confirmed the necessity of treatment.

39. Throughout this period, Defendant Shelton, as Health Services Administrator, had supervisory authority over medical care delivery at FCI Memphis. She was responsible for ensuring that BOP medical policies were followed and that inmates received medically necessary care. She failed to intervene despite receving Plaintiff's grievances documenting the denial of prescribed medications.

40. Defendant Shelton knew or should have known that Martz was discontinuing long-term prescribed medications without physician authorization and that Plaintiff was suffering serious harm as a result. Despite this knowledge, she took no action to ensure Plaintiff received his prescribed treatment.

F. Defendants' Knowledge and Deliberate Indifference

41. Defendants knew Plaintiff had a serious medical condition requiring treatment. Plaintiff's medical records, which all Defendants reviewed, clearly documented his Lupus diagnosis and eight years of successful treatment with prednisone.

42. Defendant Martz knew that discontinuing prednisone after eigth years

of continous use would cause Plaintiff serious harm. When Plaintiff told
When Plaintiff told her he needed the medication and explained his medical
history, she acknowledged reviewing his charts but refused treatment anyway,
stating, "I am not going to give you all that medication prednisone pill or
injection."

43. Plaintiff returned to sick call week after week showing Martz open
sores, lesions, rashes, and a growing knot on his shoulder. Each visit put
Martz on direct notice that Plaintiff was suffering serious harm. She saw
the physical evidence of untreated Lupus but continued refusing treatment.

44. Defendant Dre Gill, as supervising physician and Clinical Director,
reviewed Plaintiff's medical records and cosigned Martz's orders discontinuing
the prescribed medications. She had direct knowledge of Plaintiff's documented
medical need for prednisone and omeprazole.

45. Despite her supervisory duty to ensure appropriate medical care,
Dr. Gill refused to examine Plaintiff or meet with him to address his complaints.
She deliberately avoided seeing Plaintiff to prevent having to respond to
his medical needs.

46. Dr. Gill's refusal to conduct a physician evaluation before discon-
tinuing eigth years of prescribed medication violated basic medical standards.
Her decision to approve Martz's actions despite knowing Plaintiff's medical
history demonstrated deliberate indifference to the substantial risk of serious
harm.

47. Defendant Shelton received Plaintiff's grievances documenting the
denial of prescribed medications and the resulting physical harm. As Health
Services Administrator, she had authority to intervene and ensure BOP medical
policies were followed. She failed to take any action despite documented
knowledge of Plaintiff's deteriorating condition.

48. The June 2024 rheumatology consultation confirmed that Plaintiff's

8

Lupus required the prednisone treatment he had been denied. The specialist's prescription validated what Plaintiff had been telling Defendants for nine months. This confirmed that Defendants' prior denials lacked any legitimate medical justification.

G. Violation of Medical Standards and BOP Policies

49. Medical guidelines require that patients on long-term prednisone therapy undergo gradual tapering over many months before discontinuation. Abrupt cessation after eigth years of continuous use violates universal medical standards.

50. The recognized standard of care in Tennessee and nationally requires that before discontinuing prednisone after long-term use, a physician must conduct adrenal function testing, evaluate the patient's current disease status, and implement a tapering protocol to prevent adrenal crisis.

51. Nurse Martz violated medical standards by discontinuing Plaintiff's prednisone without physician authorization, without conducting any testing, without examining Plaintiff's current condition, and without implementing any taper protocol.

52. The standard of care also requires that a physician, not a nurse practitioner acting independently, make decisions about discontinuing long-term prescribed medications. In Tennessee and all U.S. jurisdictions, nurses lack authority to unilaterally discontinue physician orders.

53. Martz's actions exceeded her scope of practice under Tennessee law and BOP regulations. Her statement that the prescribed prednisone was "too much" lacked any medical or scientific basis and contradicted eigth years of successful treatment and the subsequent pheumatologist's prescription.

54. For GERD treatment, the American College of Gastroenterology and American Gastroenterological Association guidelines (2022) establish that proton pump inhibitors like omeprazole are the medical treatment of choice

for GERD and recommend maintenance therapy indefinitely for patients with established disease.

55. Discontinuing Plaintiff's omeprazole and telling him to purchase weaker over-the-counter products violated medical guidelines, particularly given his concurrent high-dose prednisone use which increases risk of gastro-intestinal complications.

56. Defendants violated multiple BOP Program Statements governing inmate healthcare:

a. BOP Program Statement 6031.06 requires that all chronic care patients be enrolled in Chronic Care Clinics and receive physician evaluation within 30 days. Defendants failed to enroll Plaintiff in the Chronic Care Clinic and failed to schedule physician evaluation.

b. BOP Program Statement 6027.02 requires physician supervision of nurse practitioners' independent medical decisions. Dr. Gill failed to provide appropriate supervision and instead rubber-stamped Martz's medically unsound decisions.

c. BOP Program Statement 6360.02 establishes that chronic care medication orders are valid for 90 days with 365-day refills and requires maintaining continuity of care for chronic medications. Defendants failed to continue Plaintiff's chronic care medications despite valid prior orders.

57. These policy violations were not mere administrative oversights. Defendants' refusal to follow BOP's own medical policies demonstrated arbitrary and capricious action in violation of the Administrative Procedure Act.

COUNT I
FEDERAL TORT CLAIMS ACT - MEDICAL NEGLIGENCE
(Against Defendant United States of America)

58. Plaintiff incorporates all preceding allegations.

59. At all relevant times, Defendants Gill, Martz, and Shelton were employees of the United States acting within the scope of their employment at FCI Memphis.

60. Under Tennessee law, medical negligence requires proof of: (1) the

10

recognized standard of acceptable professional practice; (2) that defendants acted with less than reasonable care in accordance with that standard; and (3) that plaintiff suffered injuries as a proximate result of the negligent act or omission. Tenn. Code Ann. § 29-26-115(a).

61. The recognized standard of acceptable professional tractice in Tennessee and similar communities requires that physicians and nurse practitioners treating Lupus patients who have been successfully managed on prednisone for eigth years: (a) conduct a physician evaluation before discontinuing or modifying the treatment regiment; (b) implement a gradual tapering protocol over many months rather than abrupt cessation; (c) test adrenal function before discontinuation; and (d) monitor the patient closely for disease flares.

62. The standard of care for discontinuing long-term corticosteroid therapy requires tapering over approximately 9-12 months for a patient suppressed for eigth years, with the general rule being one month of recovery time for each month of hypothalamic-pituitary-adrenal axis suppression.

63. Medical literature uniformly establishes that abrupt cessation of prednisone after long-term use creates a 100% likelihood of complete adrenal atrophy and substantial risk of life-threatening adrenal crisiss including hypotension, hyponatremia, renal failure, and potential death.

64. The medical standard also requires that nurse practitioners may not independently discontinue physician-ordered medications. In Tennessee and all U.S. jurisdictions, registered nurses and nurse practioners lack authopity to unilaterally discontinue physician orders. Only physicians or providers specifically authrotized by state law may make such decisions.

65. For treating GERD, the standard of care established by the American College of Gastroenterology 2022 Guidelines requires: (a) proton pump inhibitors as first-line therapy; (b) maintenance therapy indefinitely for established disease; and (c) continued gastroprotection when patients are taking high-

11

risk medications like prednisone.

66. The reeognized standard requires prescription-strength omeprazole (20-40mg daily) for established GERD, not over-the-counter antacids. The standard also requires physician authroization before any changes to prescribed medications.

67. Defendants Gill, Martz, and Shelton breached the applicabale standard of care through the following acts and omissions:

a. Discontinuing Plaintiff's prednisone abruptly without physician examination, without adrenal function testing, and without implementing any tapering protocol;

b. Allowing a nurse practitioner to independently discontinue physioiàn-ordered medications in violation of nursing scope of practice;

c. Refusing to provide prescribed treatment despite reviewing medical records documenting eigth years of successful disease control;

d. Failing to conduct physician evaluation within 30 days as required for chronic care patients;

e. Discontinuing prescription-strength omeprazole and substituting inadequate over-the-counter products without physician authorization;

f. Ignoring visible signs of disease progression (open sores, lesions, rashes) during repeated sick call visits;

g. Failing to provide adequate supervision of nurse practitioner decisions;

h. Failing to intervene despite administrative knowledge of denial of prescribed medications through the grievance process;

i. Refusing to provide the full prednisone regimen ordered by the outside rheumatologist in June 2024.

68. These breaches of the standard of care were substantial, clear, and indefensible. Defendants' conduct fell far below what any reasonable medical professional would have done under the same circumstances.

12

69. As a direct and proximate result of Defendants' negligence, Plaintiff suffered severe physical injuries including:

a. Five months of severe, continuous pain from untreated Lupus;

b. Permanent, disfiguring scars on his hands, neck, and back;

c. Open sores and lesions across his skin that became infected;

d. Painful rash, joint pain, fatigue, and swelling;

e. A large knot on his right shoulder;

f. Five months of pain from untreated GERD with daily acid reflux causing esophageal burning.

70. Plaintiff's injuries would not have occurred but for Defendants' negligent refusal to provide prescribed medications. The casual connection is direct and unbroken: medication discontinuation led immediately to disease flare, which caused the painful symptoms and permanent scarring.

71. The severity of Plaintiff's injuries demonstrates the foreseeability of harm. Any reasonable medical professional would have known that discontinuing prednisone after eigth years would cause serious harm to a Lupus patient.

72. Plaintiff continues to suffer from the permanent scarring, which affects his self-esteem, emotional weel-being, and willingness to engage in social relationships. He feels ashamed of his physical appearance and avoids situations where others might see his scars.,

73. Plaintiff seeks compensatory damages in an amount to be determined at trial for his past and ongoing physical pain, permanent scarring and dis-figurement, emotional distress, and mental anguish.

COUNT II
BIVENS CLAIM – EIGHTH AMENDMENT DELIBERATE INDIFFERENCE
(Against Defendants Gill, Martz, and Shelton in Their Individual Capacities)

74. Plaintiff incorporates all preceding allegations.

75. The Eighth Amendment prohibits cruel and unusual punishment, including deliberate indifference to serious medical needs. Estelle v. Gamble, 429 U.S.

13

97, 104 (1976).

76. A serious medical need exists when: (a) a physician has diagnosed the condition as requiring treatment, or (b) the need is so obvious that even a layperson would recognize the necesity for medical attention. Blackmore v. Kalamazoo Cnty., 390 F.3d 890, 897 (6th Cir. 2004).

77. Plaintiff's Lupus and GERD constitute serious medical needs. Both conditions were diagnosed by physicians as requiring treatment. Plaintiff's Lupus had been treated continously for eight years, demonstrating that physicians considered it serious enough to warrant long-term medication. The subsequent rheumatologist's June 2024 prescription confirmed the ongoing need for treatment.

78. The objective seriousness of these conditions is beyond dispute. Without treatment, Lupus causes severe pain, organ damage, and permanent disfigurement, as occurred here. Without treatment, GERD causes painful acid reflux and potential permanent damage to theresophagus.

79. Deliberate indifference requires that defendants subjectively knew of an excessive risk to the plaintiff's health or safety and disregarded that risk. Farmer v. Brennan, 511 U.S. 825, 837 (1994). The defendant must be aware that inference. Id.

80. Defendants Gill, Martz, and Shelton each personally knew of Plaintiff's serious medical needs and deliberately disregarded the substantial risk of harm through their own individual actions.

Defendant Martz's Deliberate Indifference:

81. Defendant Martz reviewed Plaintiff's medical records showing his Lupus diagnosis and eight years of prednisone treatment. She had actual knowledge that Plaintiff had a serious medical condition requiring treatment.

82. Plaintiff directly told Martz: "I have lupus and it is going to be a problem because I need my medications." This statement put Martz on explicit notice of Plaintiff's medical condition and need for continued treatment.

14

83. When Plaintiff explained that prednisone had successfully controlled his Lupus for eight years, Martz acknowledged this history. She stated "I am not going to give you all that prednisone" after reviewing his charts, demonstrating she knew about the prior successful treatment but chose to deny it anyway.

84. Any nurse practitioner with basic medical training knows that discontinuing long-term prednisone creates serious risks. Medical knowledge of adrenal suppression and the need for tapering is fundamental to healthcare practice. Martz either knew these risks or deliberately remained ignorant of them while making medical decisions.

85. Plaintiff returned to sick call repeatedly over five months showing Martz the direct physical evidence of untreated Lupus: open sores on his hands and in his mouth, rashes on his neck and back, and a growing knot on his shoulder. Each visit confronted Martz with objective proof that Plaintiff was suffering serious harm from lack of treatment.

86. Despite seeing these worsening symptoms week after week, Martz continued refusing treatment. She did not refer Plaintiff to a physician. She did not order any diagnostic tests. She did not provide any medications. She simply ignored the visible evidence of serious harm.

87. When Plaintiff told Martz about the permanent scarring developing from untreated Lupus, she responded: "Still, I am not going to give you all that medication prednisone pill or injection." This statement proves she knew Plaintiff was suffering permanent harm but deliberately chose to deny treatment anyway.

88. Martz's conduct went beyond negligence or medical malpractice. She did not make a mistaken medical judgment. She deliberately refused to provide treatment despite knowing Plaintiff had a serious medical condition, despite seeing objective evidence of deteriorating health, and despite being told

15

about permanent scarring.

89. In June 2024, when the outside rheumatologist prescribed a specific prednisone protocol and omeprazole, Martz again refused to provide the full treatment ordered by the specialist. This demonstrated that her refusal to treat Plaintiff was not based on any legitimate medical judgment but rather on deliberate indifference to his medical needs.

90. Martz's actions were not authorized by any BOP policy and were not supported by any reasonable medical judgment. She acted with deliberate indifference to Plaintiff's serious medical needs in violation of the Eighth Amendment.

Defendant Dr. Gill's Deliberate Indifference:

91. Defendant Dr. Gill, as Clinical Director and supervising physician at FCI Memphis, had supervisory authority over all medical staff and final authority over all medication decisions.

92. Dr. Gill reviewed Plaintiff's medical records, including the documentation of his Lupus diagnosis and eight years of prednisone treatment. She had actual knowledge of Plaintiff's serious medical condition.

93. Dr. Gill reviewed and cosigned Martz's orders discontinuing Plaintiff's prednisone and omeprazole. By cosigning these orders, she personally authorized the denial of medically necessary treatment.

94. As a physician, Dr. Gill knew or shuold have known that discontinuing predisone after eight years without tapering violates basic medical standards and creates serious risk of harm. Physicians receive extensive training on corticosteroid management and adrenal suppression. This is fundamental medical knowledge.

95. Dr. Gill knew or should have known that nurse practitioners may not independently discontinue physician-ordered medications. As the supervising physician, she had a duty to ensure Martz's decisions complied with medical

16

standards and nursing scope of practice. Her failure to stop Martz's unauthorized medication discontinuation demonstrated deliberate indifference.

96. Despite her supervisory responsibilities and Plaintiff's requests to see her, Dr. Gill deliberately avoided examining Plaintiff or meeting with him. Staff reported that she "would hide in her office" to avoid seeing inmates. This deliberate avoidance prevented Dr. Gill from having to respond to Plaintiff's medical needs.

97. Dr. Gill's refusal to conduct a physician evaluation before approving discontinuation of eight years of prescribed medication violated BOP Program Statement 6031.05 and demonstarted deliberate indifference. She approved a serious medical decision wiuthout ever examining the patient or assessing his condition.

98. Dr. Gill received Plaintiff's grievances and sick call requests documenting his deteriorating condition. Despite this knowledge, she took no action to  provide treatment or ensure Martz was following appropriate medical standards.

99. Dr. Gill's deliberate avoidance of Plaintiff, combined with her approval of Martz's medically unsound decisions, constituted deliberate indifference. She knew Plaintiff had a serious medical condition requiring treatment. She knew Martz was denying that treatment. She deliberately chose not to intervene, thereby causing Plaintiff to suffer five months of unncessary pain and permanent scarring.

Defendant Shelton's DeliberaterIndifference:

100. Defendant Shelton, as Health Services Administrator at FCI Memphis, had supervisory authority over healthcare delivery and was responsible for ensuring compliance with BOP medical policies.

101. Shelton received Plaintiff's grievances documenting the denial of prescribed medications for Lupus and GERD. These grievances put her on direct

17

notice that Plaintiff had serious medical conditions and was being denied necessary treatment.

102. As HSA, Shelton knew or should have known that BOP Program Statement 6031.05 requires chronic care patients to be enrolled in Chronic Care Clinics and receive physician evaluation within 30 days. She knew or should have known that Martz had discontinued Plaintiff's chronic care medications without following this protocol.

103. Shelton had authority to intervene and ensure BOP medical policies were followed. Despite receiving grievances documenting policy violations and denial of treatment, she took no action.

104. Shelton's failure to intervene despite documented knowledge of medication denials and Plaintiff's deteriorating condition demonstrated deliberate indifference. She knew Plaintiff was suffering serious harm. She had authority to ensure he received proper care. She deliberately chose not to act.

105. The BOP grievance responses that Shelton approved or was aware of acknowledged Plaintiff was on a waiting list for a rheumatologist did not address his immediate need for medication or explain why his previously prescribed medications had been discontinued.

106. Shelton's administrative role did not insulate her from liability. She personally participated in denying Plaintiff access to necessary medical care through her failure to respond to documented policy violations and medication denials.

Harm and Causation:

107. Each Defendant's deliberate indifference directly caused Plaintiff to suffer five months of severe physical pain, permanent disfiguring scars, and ongoing emotional distress.

108. Had any Defendant provided the prescribed medications or ensured proper physician evaluation, Plaintiff would not have suffered these injuries.

The casual link between Defendants' deliberate indifference and Plaintiff's harm is direct and undeniable.

109. Plaintiff seeks compensatory damages from each Defendant in their individual capacity for past and ongoing physical pain, permanent scarring and disfigurement, emotional distress, and mental aguish.

110. Plaintiff seeks punitive damages from each Defendant in their individual capacity. Defendants' conduct was malicious and reckless, demonstrating callous indifference to Plaintiff's federally protected rights and involving evil motive or intent. Defendants deliberately refused treatment despite knowing Plaintiff was suffering serious harm, warranting punitive damages to punish such egregious conduct and deter similar violations.

## COUNT III
## ADMINISTRATIVE PROCEDURE ACT
### (Against All Defendants)

111. Plaintiff incorporates all preceding allegations.

112. The AdministrativerProcedure Act provides that "a person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702.

113. Under 5 U.S.C. § 706, a reviewingfcourt shall "hold unlawful and set aside agency action, findings, and conclusions" that are "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" or "(C) in excess of statutory jurisidiction, authority, or limitations, or short of statutory right."

114. Plaintiff has standing to bring this APA claim. Hersuffered concrete injury in fact: physicalkpain, permanent scarring, and untreated medical conditions. These injuries are fairly traceable to the BOP's denial of prescribed medications. The injuries are redressable through declaratory and injunctive relief requiring the BOP to comply with its statutory duties and established

policies.

115. Plaintiff's injuries fall within the zone of interests protected by 18 U.S.C. § 4052(a)(2), which requires the BOP to provide for the "safekeeping, care, and subsistence" of federal prisoners, and 18 U.S.C. § 4051(b)(1), which requires the BOP to ensure "that all prisoners receive adequate health care."

116. The BOP's actions constitute final agency action. The decisions to discontinue Plaintiff's medications and deny his grievances mark the consummation of the agency's decision-making process and determined Plaintiff's rights. These decisions created legal consequences by denying him medically necessary treatment required by statute.

117. Plaintiff exhausted administrative remedies by filing grievances at all levels of the BOP administrative remedy process. The BOP denied relief at each level.

118. The BOP's denial of medically necessary treatment violated 18 U.S.C. § 4042(a)(2), which mandates that the BOP provide for the care of federal prisoners. The statute does not grant the BOP discretion to deny medically necessary treatment.

119. The BOP's actions violated its own Program Statements:

a. BOP Program Statement 6031.04 requires the BOP to "effectively deliver medically necessary health care to inmates."

b. BOP Program Statement 6031.05 requires that chronic care patients be enrolled in Chronic Care Clinics and receive physician evaluation within 30 days. Defendants failed to enroll Plaintiff in the required clinic and failed to provide physician evaluation before discontinuing his chronic care medications.

c. BOP Program Statement 6027.02 requires physician supervision of nurse practitioners' independent medical decisions. Dr. Gill failed to provide appropriate supervision and instead approved medically unsound decisions.

20

d. BOP Program Statement 6360.02 establishes that chronic care medication orders are valid for 90 days with 365-day refills and requires maintaining continuity of care for chronic medications. Defendants discontinued valid chronic care medication orders without medical justification.

e. BOP Program Statement 6190.04 governs infectious disease management and requires appropriate treatment to prevent complications. Defendants' denial of treatment allowed Plaintiff's condition to worsen, causing infections in his skin lesions.

120. The BOP's decisions to discontinue Plaintiff's medications were arbitrary and capricious because:

a. The decisions lacked any rational medical basis and contradicted eight years of successful treatment;

b. The decisions were made by a nurse practitioner without physician authorization, exceeding the scope of nursing practice;

c. The decisions violated BOP's own medical policies requiring physician evaluation and chronic care protocols;

d. The decisions disregarded relevant factors including Plaintiff's documented medical history, the severeity of his conditions, and for the forseeable harm from discontinuing treatment;

e. The decisions departed from established medical standards without explanation;

f. Even after an outside rheumatologist prescribed treatment confirming Plaintiff's medical needs, Defendants refused to provide the full prescribed regimen, demonstrating the arbitrary nature of their actions.

121. The BOP's actions were contrary to law because they violated:

a. The statutory mandate in 18 U.S.C. § 4042(a)(2) to provide for prisoners' care;

b. The statutory requirement in 18 U.S.C. § 4051(b)(1) to ensure adequate

21

health care;

c. The Eighth Amendment's prohibition on deliberate indifference to serious medical needs;

d. Federal regulations at 28 C.F.R. § 549.11 requiring the BOP to manage infectious diseases through "appropriate treatment";

e. The BOP's own Program Statements establishing medical care standards.

122. The BOP's application of its policies in this case was arbitrary and capricious. The BOP has policies requiring appropriate medical care for chronic conditions, but Defendants arbitrarily refused to follow those policies in Plaintiff's case without any legitimate justification.

123. Plaintiff continues to need proper medical treatment for his Lupus and GERD. The BOP has a continuing duty under federal law to provide medically necessary care.

124. Plaintiff seeks declatory relief under 5 U.S.C. § 706 declaring that:

a. The BOP's denial of prescribed medications violated 18 U.S.C. § 4042(a)(2) and § 4051(h)(1);

b. The BOP's discontinuation of chronic care medications without physician evaluation violated BOP Program Statements 6031.05, 6027.02, and 6360.02;

c. The BOP's application of its medical policies was arbitrary and capricious in violation of 5 U.S.C. § 706(2)(A);

d. The BOP exceeded its statutory authroity by denying medically necessary treatment.

125. Plaintiff seeks injunctive relief under 5 U.S.C. § 706 requiring:

a. The BOP to provide prescribed medications for Plaintiff's Lupus and GERD as ordered by treating physicians;

b. The BOP to enroll Plaintiff in the Chronic Care Clinic as required by Program Statement 6031.05;

22

c. The BOP to ensure physician supervision of nurse practitioners' medical decisions as required by Program Statement 6027.02;

d. The BOP to implement procedures to prevent further arbitrary denials of prescribed medications.

## IV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court:

As to Count I (FTCA Medical Negligence against United States):

1. Enter judgment in favor of Plaintiff and against Defendant United States of America;

2. Award compensatory damages in an amount to be determined at trial for past physical pain and suffering, ongoing physical pain and suffering, permanent scarring and disfigurement, past emotional distress, ongoing emotional distress, and mental anguish;

As to Count II (Bivens Eighth Amendment against Individual Defendants):

3. Enter judgment in favor of Plaintiff and against Defendants Gill, Martz, and Shelton in their individual capacities;

4. Award compensatory damages against each Defendant in their individual capacity in an amount to be determined at trial for past physical pain and suffering, ongoing physical pain and suffering, permanent scarring and disfigurement, past emotional distress, and mental aguish;

5. Award punitive damages against each Defendant in their individual capacity in an amount sufficient to punish their egregious conduct and deter future violations;

As to Count III (Administrative Procedure Act):

6. Declare that the BOP's denial of prescribed medications violated 18 U.S.C. § 4042(a)(2) and § 4051(b)(1);

7. Declare that the BOP's actions were arbitrary, capricious, and contrary to law in violation of 5 U.S.C. § 706;

23

8. Enjoin the BOP to provide prescribed medications for Plaintiff's Lupus and GERD;

9. Enjoin the BOP to enroll Plaintiff in required Chronic Care Clinics;

10. Enjoin the BOP to ensure proper physician supervision of nurse practitioners' medical decisions;

As to all Claims:

11. Award costs of this action; and

12. Grant such other and further relief as this Court deems just and proper.

Respectfully submitted,

Ronald L. Mabine
USMS No. 12562-007
LSCI Butner
P.O. Box 999
Butner, NC 27509-0999
Plaintiff, Pro Se

24